J-S05002-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| P.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| L.M. | : | |
| | : | |
| | : | No. 1637 MDA 2019 |

Appeal from the Order Entered September 6, 2019
In the Court of Common Pleas of Centre County Civil Division at No(s):
2017-2654

BEFORE:  SHOGAN, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 20, 2020**

P.M. ("Father") appeals *pro se* from the order[1] that granted L.M. ("Mother") sole legal custody of R.M., born in October of 2008, shared legal custody of M.M., born in March of 2014, (collectively, "the Children"), and primary physical custody of the Children.[2]  The order also granted Mother's

---

[1]  The subject order was entered September 6, 2019, granting in part and denying in part the relief requested in Father's motion for reconsideration of the order dated April 22, 2019, and entered April 23, 2019.  Although the order is dated September 5, 2019, it was not entered until September 6, 2019.  Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)."  Pa.R.A.P. 108(b).  Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given."  ***Frazier v. City of Philadelphia***, 735 A.2d 113, 115 (Pa. 1999).

[2]  R.M. is the biological son of Mother and the adopted son of Father.  M.M. is the biological son of both parents.

relocation petition, and ordered that the Children did not need to be vaccinated. Upon review, we affirm.

The record reveals the following background. The parties were married in October of 2013 and at that time, lived together in State College, Pennsylvania. Petition for Change of Venue, 4/25/18, at 1-2. From July of 2014 until August of 2016, the family lived in Qatar. *Id.* From September of 2016 through December of 2016, the parties resided in Centre County, Pennsylvania. *Id.* In December of 2016, Mother temporarily moved with the Children to Crawford County, Pennsylvania, but returned to Centre County in January of 2017. *Id.* The parties then lived together in Centre County from January of 2017 until April of 2017, when they separated following the filing of a protection from abuse ("PFA") petition by Mother against Father, and the filing of a PFA petition by Father against Mother. *Id.*

On July 18, 2017, Father filed a complaint for custody. On August 16, 2017, Father filed an emergency petition for special relief regarding school choice. On August 23, 2017, Mother filed objections to the emergency petition. On August 25, 2017, the court entered an order granting Father supervised visits with the Children at the Centre County Child Access Center. On August 25, 2017, the court appointed a guardian *ad litem* ("GAL") for the Children.

On September 25, 2017, Father filed a petition for psychological and custody evaluations, contending that Mother suffered from obsessive

compulsive disorder and was attempting to alienate the Children from him. On October 2, 2017, the court granted Father's petition for psychological evaluations and dismissed his emergency petition as moot. On October 10, 2017, Mother filed a cross-complaint for custody and a petition for relocation.

On March 2, 2018, Father filed a petition to modify custody and a petition for contempt of custody order against Mother. On April 25, 2018, Mother filed a petition to change venue and modify the supervised visitation schedule. On May 2, 2018, Father filed a second petition for contempt. On May 16, 2018, Father filed a petition for emergency custody and, on June 6, 2018, a petition to amend his filings and terminate his temporary PFA. The court denied Father's petition for emergency custody on June 7, 2018. On June 22, 2018, Mother filed a motion for special relief. On July 16, 2018, the court denied Mother's petition for change of venue. On July 26, 2018, Mother filed a motion for reconsideration and petition to confirm relocation. On July 27, 2018, Father filed an answer in opposition and his own motion for special relief.

On September 7, 2018, the court denied Mother's petition to confirm relocation, denied Mother's motion for reconsideration, granted Mother's motion to modify the custody order and appointed Bobbi Dawley-Kissman, M.A. ("Ms. Kissman"), to perform the custody evaluation and Anna Mercatoris, M.A., as the Children's counselor, and denied Mother's motion to modify supervised visitation.

On October 1, 2018, the court granted Father's petition for disobedience of custody order in part, and ordered Mother to provide Father with information regarding the Children's medical, dental, and educational care, and their extracurricular activities; denied Father's petition for civil contempt; denied Father's petition to amend the custody filings; and ordered that Father could have Skype contact with M.M. via an appointed counselor. On January 22, 2019, Father filed a petition for special relief, seeking amendments to the custody order, including that Mother be required to vaccinate the Children.

The court held custody hearings on February 11, February 12, and March 4, 2019. Father represented himself during these hearings and testified on his own behalf. Father presented the testimony of Ms. Kissman, the custody evaluator; and H.C., a family friend. Mother testified on her own behalf and presented the testimony of Charles Kroboth, Esquire, the GAL; J.S., a family friend; Anna Mercatoris, M.M.'s counselor; Kristin Palmer, a caseworker for Centre County CYS; M.F., a friend of Mother; Robert Iddings, Ph.D., R.M.'s counselor; and Brittany Mears, Ph.D., Mother's counselor.

In an order dated April 22, 2019, and entered on April 23, 2019, the court issued its custody determination granting shared legal custody of M.M. to both parents, sole legal custody of R.M. to Mother, and primary physical custody of both Children to Mother. On May 3, 2019, Father filed a motion for reconsideration requesting a reversal of the reduction in visiting hours with

M.M., changes in the summer visitation schedule, and changes in the overnight schedule. He also requested that he be given full access to information concerning R.M.; full parental access with respect to R.M.'s school; that he be provided all information regarding providers of sports and recreation; and that Father and Mother be instructed to follow a medical practitioner's instructions, including vaccinations and other prescription medications. On May 6, 2019, the court expressly granted reconsideration; a hearing on the motion was scheduled for June 5, 2019, but was continued to September 4, 2019.

On September 4, 2019, the court held a hearing on the reconsideration motion and, on September 5, 2019, issued an order granting, in part, the requested relief, and denying, in part, the requested relief. Father was given access to R.M.'s educational and medical records and information as to his extracurricular activities. Dr. Robert Iddings was to provide a report to the court within thirty days as to his recommended plan and any progress in reunification between R.M. and Father. On October 2, 2019, Father timely filed a notice of appeal and a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[3]

---

[3] Father properly filed his notice of appeal pursuant to *Valley Forge Ctr. Assocs. v. Rib-It/K.P., Inc.*, 693 A.2d 242, 243 (Pa. Super. 1997) (stating that trial court could retain its ability to review its order for thirty days only if a petition for reconsideration has been timely filed and the court has entered an order expressly granting the motion). "[T]he 30-day appeal period is tolled only by a timely order 'expressly granting' reconsideration." *Id.* at 245.

On appeal, Father raises the following issues for our review:

1. Should Mother have sole judicial custody of R.M.?

2. Should the children be vaccinated?

3. Should only Father and not Mother have to ensure that M.M. takes all his prescribed medications given physical custody is primarily granted to Mother?

*See* Father's Brief at 5.[4],[5]

The scope and standard of review in custody matters is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa. Super. 2013).

---

[4] We have reordered Father's issues for ease of disposition.

[5] In its April 22, 2019 opinion and order, the trial court addressed the best interests of the Children regarding the relocation aspect of the order. However, because Father did not challenge relocation in his Pa.R.A.P. 1925(b) statement or in his brief, we will not address this issue.

Prior to addressing the merits of Father's appeal, we must first determine whether he has preserved his issues for review. **_Tucker v. R.M. Tours_**, 939 A.2d 343, 346 (Pa. Super. 2007) (citing **_Commonwealth v. Wholaver_**, 903 A.2d 1178 (Pa. 2006) (holding this Court may _sua sponte_ determine whether issues have been properly preserved for appeal). Pennsylvania Rule of Appellate Procedure 2111 outlines the required elements of an appellant's brief. With regard to the argument section of the brief, Pa.R.A.P. 2119 provides, in relevant part, as follows:

**(a) General rule.** The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

**(b) Citations of authorities**. Citations of authorities in briefs shall be in accordance with Pa.R.A.P. 126 governing citations of authorities.

**(c) Reference to record.** If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears (see Pa.R.A.P. 2132).

**(d) Synopsis of evidence.** When the finding of, or the refusal to find, a fact is argued, the argument must contain a synopsis of all the evidence on the point, with a reference to the place in the record where the evidence may be found.

**(e) Statement of place of raising or preservation of issues.** Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating

- 7 -

thereto as required by Pa.R.A.P. 2117(c), or substantially the same information.

Pa.R.A.P. 2119(a)-(e).

"[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." ***In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011); ***In re M.Z.T.M.W.***, 163 A.3d 462, 465-466 (Pa. Super. 2017); ***see also Estate of Haiko v. McGinley***, 799 A.2d 155, 161 (Pa. Super. 2002) (appellant must support each issue raised by discussion and analysis of pertinent authority; without discussion of law in appellate brief, appellant hampers this Court's review and risks waiver; "It is not this Court's function or duty to become an advocate for the appellant").

Furthermore, Pa.R.A.P. 2101 provides:

Briefs and reproduced records shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed, and, if the defects are in the brief or reproduced record of the appellant and are substantial, the appeal or other matter may be quashed or dismissed.

We have held that an appeal may be dismissed and/or quashed where the deficiencies of the appellant's brief are such that we are unable to conduct a meaningful review. ***Karn v. Quick & Reilly, Inc.***, 912 A.2d 329, 337 (Pa. Super. 2006). While this Court construes the filings of a *pro se* litigant liberally, "any person choosing to represent himself in a legal proceeding must, to a reasonable extent, assume that his lack of expertise and legal

- 8 -

training will be his undoing." ***Wilkins v. Marsico***, 903 A.2d 1281, 1284–1285 (Pa. Super. 2006) (finding sufficient grounds to quash appellant's *pro se* appeal due to deficiencies in his brief, but ultimately declining to do so).

In the instant case, Father's brief is not compliant with Pa.R.A.P. 2111 or 2119. His argument consists of numbered and lettered bullet statements. Father's Brief at 8-13. Father cites to no case law, statute, or other legal authority to support his arguments. Father fails to provide a synopsis of the evidence and does not consistently cite to the places in the record where his argument is supported. Although he is a *pro se* litigant, Father is required to follow the Rules of Appellate Procedure. Because Father has failed to do so, we find that he has waived his issues for purposes of appeal. ***W.H.***, 25 A.3d at 339 n.3; ***M.Z.T.M.W.***, 163 A.3d at 465-466; ***Wilkins***, 903 A.2d at 1284-1285. Even if we did not find waiver, however, we would find Father's issues to be without merit.

"[W]hen making a custody award, '[t]he court shall delineate the reasons for its decision on the record in open court or in a written opinion or order.'" ***M.J.M.***, 63 A.3d at 335. Section 5328(a) of the Custody Act delineates the factors to be considered by the court:

> **(a) Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by

another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Father's brief essentially covers the following issues: whether the court erred in granting Mother sole legal custody of R.M.; in concluding that the Children did not need to be vaccinated; and in failing to order Mother to also give M.M. all of his medications. Father's Brief at 8-12. Father also argues that there are "substantial factual errors and biased elicitation of facts in the order." Father's Brief at 11-12.

We first address Father's claims of "factual errors" to the extent these allegations impact the issues Father raises in his Statement of the Questions Involved. Father argues that Mother engaged in parental alienation, and he contends that the trial court ignored the custody evaluator's observations. Father's Brief at 12-13. Father points to two paragraphs in the custody evaluation prepared by Ms. Kissman, introduced at the hearing as Exhibit A, in support of his argument:

One of the general rules that the courts should consider, among other factors, is which parent is more likely to encourage, permit, [and] allow frequent and continuing contact, and physical access between the non-custodial parent and the child. It is this examiner's opinion that [Father] is the parent who is more likely

to engage in these behaviors, while [Mother] appears to be more negative and sabotaging in her co-parenting.

and

Father makes allegations that he believes Mother is attempting to alienate [R.M.] from him. While this examiner believes these allegations are serious and have merit, the best course of treatment, at this time, would be counseling. Unfortunately, alienation is difficult to prove, but it is this examiner's belief that [R.M.'s] perception of his relationship with his father is skewed at this time. It is hoped[,] through therapeutic intervention, that the goal of reunification can be accomplished.

Father's Brief at 12-13 (emphasis omitted).[6]

In addressing this issue, the trial court observed:

Father filed for [c]ustody modification seeking sole physical custody in part because of his allegations of Mother's interference with his ability to contact and see the children. . . . Father has had no contact with R.M. since April 2017. He continues to have supervised visitation with M.M. at the Child Access Center (CAC). Mother often reschedules or misses visitations for varying reasons, and Father has also missed several visitations. Mother does not always inform Father about doctor's appointments and school events. Mother has been hesitant to allow frequent and continuing contact of the [C]hildren with Father due to incidents of abuse by Father.

Father believes Mother has actively engaged in alienating him from the [C]hildren. However, the [c]ustody [e]valuator, as well as three experts, all confirm there is no parental alienation by Mother.

Trial Court Opinion, 4/22/19, at 1-2.

_____

[6] The first custody factor is which party is more likely to encourage and permit frequent and continuing contact between the child and the other party. 23 Pa.C.S. § 5328(a)(1).

The trial court noted several factors in favor of and against each parent: both parents have missed visitations, Mother does not always inform Father about doctor's appointments and school events, and Mother does not wish to have frequent contact between the Children and Father due to alleged incidents of abuse by Father. Trial Court Opinion, 4/22/19, at 1-2. While Ms. Kissman opined that Father was more likely to encourage and permit contact, this testimony was only part of the evidence presented and considered by the trial court. On cross-examination, Ms. Kissman acknowledged that she had not spoken to Centre County CYS, and had little information regarding the domestic violence alleged between the parties, which Ms. Kissman acknowledged would potentially change her opinion. N.T., 2/11/19, at 35-42. In fact, the trial court determined that Ms. Kissman "acknowledged that she did not speak with CYS and had little information on the alleged domestic violence between Mother and Father which could change her opinions and recommendations." Trial Court Opinion, 4/22/19, at 6-7. Dr. Iddings, Dr. Mears, and Ms. Anna Mercatoris all testified that they did not perceive parental alienation in this case. N.T., 2/12/19, at 25, 133-134, 198-199. We defer to the trial court's assessment of the weight of the evidence, and as the court's findings are supported by the record, we will not disturb them. **M.J.M.**, 63 A.3d at 334.

Father next argues that the court did not acknowledge that Father filed a PFA against Mother, and contends that his first wife did not file a PFA against him. Father's Brief at 11-12. The second custody factor identifies present

- 13 -

and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party, and which party can better provide adequate physical safeguards and supervision of the child. 23 Pa.C.S. § 5328(a)(2).

With regard to this factor, the trial court observed:

Mother filed a Protection From Abuse petition (PFA) against Father in April 2017 alleging Father abused her and R.M. She claimed on one occasion Father pushed her and she fell and hurt her shoulder, and that he pushed and shoved her other times. Both boys saw this happen. Mother alleged both physical and verbal abuse by Father over the years, including when they were in Qatar. She said he had violent rages and a temper which worsened over the years and was becoming a pattern. He primarily abused R.M., whom he adopted prior to the parties temporarily moving to Qatar: [Father] dropped [R.M.] on his head on a marble floor and made him do sit ups for minor infractions. [Mother] also claimed Father threatened R.M. by saying "If you go in there [P.M.'s (Father's daughter's) room] I'll have to remove you physically and don't blame me if you break your leg." Father admitted making such a statement, but stated it was a conditional statement only.

Mother further alleges Father favored his daughter P.M. over all of them, and P.M. was disrespectful and abusive to her and the boys. The boys claim P.M. pinched them. Father disputes these claims, and alleges it was Mother who was in fact abusive to P.M. and Father.

Evidence was also presented that Father was abusive to his first wife, [R.G.] Although [R.G.] denied any abuse, she filed a PFA against him when she initially left him and indicated in her pleadings that she 'fled the home in November 2010 due to threats of violence made by Plaintiff.' [R.G.] signed a verification for this statement in 2012, but denied it was true at this custody hearing.

Trial Court Opinion, 4/22/19, at 2-3.

Mother introduced the emergency custody complaint filed by R.G., which R.G. admitted she had signed and verified. N.T., 2/11/19, at 115-117. In the custody complaint, R.G. verified that she had fled the marital home due to threats of violence by Father. Mother's Ex. 1, at 1-2. It is unclear from the record whether R.G. actually filed a PFA against Father. However, the trial court's characterization of R.G.'s custody complaint as a PFA is harmless error given that the facts at issue was R.G.'s allegations of abuse, which were introduced by way of the custody complaint and cross-examination. *Id.* at 115-117.

With regard to Father's arguments alleging the trial court's emphasis on Father's actions rather than Mother's actions, there were testimony and pleadings throughout the case that both Mother and Father had filed PFAs against each other. Father testified regarding Mother's abuse of him and of P.M. N.T., 2/11/19, at 128-129, 141-148, 161-164. Mother also testified regarding the abuse from Father against her and R.M. N.T., 2/12/19, at 92-109. As noted, the court is free to assess the weight of the evidence and make credibility determinations, which will not be disturbed on appeal, as long as they are supported by the record. Because the trial court's determinations are supported by the record, we decline to find that the trial court abused its discretion in failing to find the second custody factor in favor of Father. *M.J.M.*, 63 A.3d at 334.[7]

_____

[7] Father does not raise specific challenges to the remaining custody factors.

- 15 -

Having addressed these claims, we consider Father's contention that the court erred in granting sole legal custody of R.M. to Mother. Father's Brief at 9-10. Father argues that no evidence established that he acted in anything but R.M.'s best interest, and notes that both the custody evaluator and the GAL proposed shared custody. *Id.* Initially, we note that Father's characterization of the evidence is inaccurate. The evidence, in fact, established the opposite conclusion.

Kristin Palmer, CYS intake worker, testified that she received a referral regarding the family in April 2017. N.T., 2/12/19, at 30. Ms. Palmer spoke to R.M. regarding his statements that Father had threatened to break his leg and that he had been dropped on his head. *Id.* at 31. R.M. also stated that he had been hit and pinched by P.M. and that Father had hurt Mother's arm or shoulder. *Id.* at 31-32, 40. Although Mother did not want to cooperate at first, she confirmed to Ms. Palmer R.M.'s accusations. *Id.* at 33. Father denied the allegations. *Id.* at 33. At that point, a PFA was filed, but because Father was going to be away for the summer, CYS determined that there was no need to open a case for services. *Id.* at 34. CYS's recommendations were that Father have supervised visitation with M.M. and no contact with R.M. until R.M.'s counselor thought contact was in R.M.'s best interest. *Id.* at 35. Nevertheless, the abuse report was determined to be valid. *Id.* at 36-37.

Attorney Charles Kroboth testified that he has been the GAL for the Children since August of 2017. *See* N.T., 2/11/19, at 215. He testified that as of the date of the hearing, it was his opinion that the Children should not

be uprooted and moved again. *Id.* at 219-220. Attorney Kroboth opined, based upon his observations of the family and after speaking to various counselors, that it was in the Children's best interests for supervised visitation for only M.M. to continue on a modified basis. *Id.* at 220-227. Attorney Kroboth stated he did not believe that Ms. Kissman had a full understanding of the dynamics of the case. *Id.* at 228. Attorney Kroboth opined that shared legal custody would be appropriate, but would let the court decide the appropriate parenting plan. *Id.* at 233-235.

M.F., Mother's friend, testified that she had known Mother and R.M. for over ten years. N.T., 2/12/19, at 46-48. Her son and R.M. are best friends. *Id.* M.F. previously witnessed Father discipline R.M.; if R.M. did not respond to questions about his homework within a certain amount of time, Father yelled "severely" at R.M. *Id.* at 54-55. M.F. Facetimed with Mother while the family was living in Qatar and became worried about her after witnessing Mother in tears during several conversations. *Id.* at 50-51. M.F. noticed a difference in R.M.'s demeanor after he returned from Qatar; he seemed withdrawn and quiet. *Id.* at 50. M.F. testified that R.M. was fearful of adults after his return. *Id.* R.M. confided in M.F. that in Qatar, Father held R.M. by his feet above the marble floor and dropped him. *Id.* at 51. R.M. also confided in M.F. that Father had threatened to break R.M.'s legs if he went into P.M.'s room. *Id.* After that conversation, M.F. was so concerned for R.M.'s safety that she called CYS. *Id.* at 52.

Mother testified that while the family was in Qatar, Father threatened to take away her visa and keep the Children with him in Qatar. N.T., 2/12/19, at 71. Mother testified that shortly after arriving in Qatar, Father became angry with her for refusing to ride in a car, and pushed and shoved her while she was holding M.M. *Id.* at 100. Mother also testified regarding another incident in Qatar where she heard R.M. crying. *Id.* When she went running to him, R.M. said, "He threw me on the floor on my head," and that it hurt. *Id.* R.M. cried for hours. *Id.* at 100-101. Mother tried to leave the apartment with the Children, but when Father realized they were trying to leave, Father ran at them, grabbed R.M., and dragged him one-half the distance of the apartment. *Id.* at 101. Mother wanted to leave Qatar but, since Father was her and the boys' sponsor, he would be notified if she tried to leave the country. *Id.* at 102.

Mother testified regarding other incidents where Father hid her car keys to prevent her from leaving or physically abused and shoved her. N.T., 2/12/19, at 102-103. Mother described an incident that occurred in Qatar where Father was "destroying" R.M.'s bedroom in a rage, and when she tried to stop him, Father bruised her arms and torso. *Id.* at 104. Mother photographed the bruises. *Id.* Mother testified that after returning to State College, Pennsylvania, Father continued to push and shove her, threatened to take the Children away from her, threatened to vaccinate the Children, and refused to allow Mother access to the Internet or to call her parents. *Id.* at 107. Mother also testified that Father forced R.M. to do sit ups and yelled at

him during homework for not doing it correctly or quickly enough. *Id.* at 119-120.

Mother described an incident leading to the filing of the PFA petition where she attempted to get around Father in the laundry room, and after some argument, he shoved her hard to the floor. N.T., 2/12/19, at 93-94. R.M. witnessed the incident. *Id.* at 95. Father then began to kick shoes around the house and the Children witnessed that. *Id.* Mother temporarily left the home after the incident and when she returned, she heard Father yelling at R.M. and threatening to break R.M.'s leg. *Id.* at 97-98. Mother testified that she wanted to leave the house again, but Father and P.M. were blocking the stairs, so she took the Children into the bedroom and locked the door and kept them in the room all night. *Id.* at 98. Mother denied ever physically abusing Father or P.M. *Id.* at 99.

Dr. Robert Iddings testified that he is a licensed psychologist specializing in working with children who have suffered trauma. N.T., 2/12/19, at 127. Dr. Iddings became involved with R.M. in November of 2017 to address R.M.'s issues with anxiety, which manifested as nightmares, inability to sleep in his own bed, difficulty socializing at school, hypervigilance, and physical complaints. *Id.* at 130. R.M. told Dr. Iddings that Father engaged in harsh discipline and threatened to take R.M. away from Mother, and that R.M. witnessed Father knocking Mother to the ground. *Id.* at 131. R.M. also stated that Father had pushed R.M. to the ground and thrown all of his belongings on the floor. *Id.* Dr. Iddings diagnosed R.M. with a moderate case of

adjustment disorder with anxiety. *Id.* at 130. Dr. Iddings was not of the opinion that R.M. was the subject of parental alienation. *Id.* at 133-134. Dr. Iddings testified that R.M. was now sleeping in his own bed, seemed calmer, and was doing well athletically, socially, and academically. *Id.* at 134. R.M. still had no desire to have contact with Father. *Id.* at 135. Dr. Iddings believed "[R.M.] has the skills to be resilient enough to have at least limited contact with his dad at this time. Whether he could tolerate ongoing, you know, unsupervised contact, I am not sure." *Id.* at 139-140.

Dr. Brittany Mears testified that she is Mother's counselor and that Mother had related incidents of abuse by Father against Mother and the Children. N.T., 2/12/19, at 214-217. Mother had suffered trauma, and her actions and responses are consistent with having suffered domestic abuse. *Id.*

Father admitted to telling R.M. that if R.M. went into P.M.'s room, Father would remove him and "I might have to take you out physically and don't blame me if you break your leg." N.T., 2/11/19, at 157-158. Father characterized this statement as "conditional". *Id.* at 157, 160. Father also admitted that he had made R.M. do physical exercise as a punishment, but claimed that this had occurred only once. *Id.* at 170-172. Father maintained that Centre County CYS recommended that he should have supervised visitation with M.M. and no contact with R.M. *Id.* at 188-189. Father acknowledged pushing Mother, although he claimed that it was in self-defense. *Id.* at 191-192.

As noted *supra*, the paramount concern in child-custody cases is the best interest of the child and requires a case-by-case assessment of all factors that may affect the physical, intellectual, moral, and spiritual well-being of the child. *M.J.M.*, 63 A.3d at 334. The trial court considered all of the evidence presented, which established that Father had abused R.M., that R.M. suffered intense anxiety as a result of that abuse, and that R.M. was not yet prepared to resume a relationship with Father. The court considered Mother's testimony and other evidence that Father was controlling and abusive, and the toxic relationship and high-conflict level between both parents such that parents are almost completely unable to communicate. While Father was granted access to R.M.'s medical and educational records, the evidence did not establish that granting joint legal custody of R.M. was in the child's best interests. Accordingly, the court did not err in granting sole legal custody to Mother while reunification therapy was ongoing. *M.J.M.*, 63 A.3d at 334.

We address Father's remaining two issues together, as they are intertwined. Father contends the court erred in ordering that neither of the Children needed to be vaccinated at this juncture. Father's Brief at 8-9. Additionally, Father argues that because Mother has primary physical custody of M.M., the court erred in ordering that Father alone give M.M. all prescribed medications. *Id.*

Pursuant to the Pennsylvania Administrative Code, children who would otherwise be required to be immunized need not be immunized if the parent "objects in writing to the immunization on religious grounds or on the basis of

a strong moral or ethical conviction similar to a religious belief." 28 Pa. Code § 23.84. As noted above, Father cites to no case law or statutory authority in support of his contentions.

Furthermore, Dr. James Mansberger, the family pediatrician of R.M. and M.M., testified that in his opinion, all children should be vaccinated pursuant to the Center for Disease Control recommendations. N.T., 3/4/19, at 4-8. However, Dr. Mansberger stated that from working with Mother over the last few years, he understands that she has a considerable amount of anxiety and distress regarding vaccines due to her belief that her first child's death was vaccine-related. *Id.* at 8. Dr. Mansberger did not have enough proof to say that the Children would have any vaccine-related problems, nor did he have enough history of the first child to corroborate if vaccines were related to that child's death. *Id.* He explained that he and Mother would "agree to disagree" on the subject. *Id*. Moreover, Dr. Mansberger testified that at no time during his meetings with Father prior to the separation did Father request that the Children be vaccinated. *Id.* at 11. Dr. Mansberger agreed that Pennsylvania allows parents to choose not to vaccinate their children. *Id.* at 12.

Mother introduced evidence that Father did not object to the Children remaining unvaccinated prior to the parties' separation and that he was using this issue as a threat in an attempt to coerce Mother to settle the custody issues. In fact, Father admitted that he sent an email to Mother in which he stated that if custody issues were settled, no one had to be vaccinated. N.T., 2/11/19, at 202-205.

Here, the trial court noted the evidence presented, namely that Dr. Mansberger believed the Children should be vaccinated and knew of no reason that they should not be vaccinated. Trial Court Opinion, 4/22/19, at 8. The court further noted the vaccination exemption law in Pennsylvania. *Id.* Thus, the court concluded that R.M. and M.M. need not be vaccinated "at this time, due to the circumstances." *Id.* The court left open the option to order vaccination in the future. *Id.* Accordingly, we conclude that the trial court did not abuse its discretion. *M.J.M.*, 63 A.3d at 334.

With regard to Father's challenge to the trial court's directive that "Father shall ensure that M.M. takes all of his prescribed medications," Father makes the following assertions:

> a. Given that Mother has primary physical custody of M.M. this is physically impossible for Father to ensure.
>
> b. No evidence has been provided that Father is against medications. On the contrary, Mother has argued against vaccinations and continues to be against Western Medicine. . . .
>
> c. Father's motion for reconsideration to either delete the unimplementable [sic] (by father) instruction (#7 of the order) of the court or to amend it to make Father and Mother both responsible for M.M. taking all his medicines was denied by Judge Ruest.
>
> d. Under the Pennsylvania constitution, Father and Mother have an expectation of equal treatment by the [c]ourt.
>
> Given the lack of evidence in this matter of any negligence with respect to giving medicine by Father to any child . . . and the fact that M.M[.]'s health (as well as R.M.'s) are ensured by both taking their prescribed medications, Judge Ruest's exempting Mother from Item #7 is in error.

Father's Brief at 10-11.

In addressing this issue, the trial court observed:

For reasons stated fully on page 8 of the [c]ourt's Opinion and Order, the [c]ourt was not willing to Order the [C]hildren to be vaccinated. The [c]ourt's acquiescence to [Father's] request to order [Mother] to administer all prescribed medications would have been akin to ordering [Mother] to vaccinate the [C]hildren. At the time of the hearing on [Father's] motion for reconsideration, the [c]ourt was not willing to reverse its decision. Further, the [c]ourt was satisfied by the evidence presented to it that [Mother] had substantially complied with administering all prescribed medications to the minor children, with the exception of the vaccinations. Thus, it was not necessary to order [Mother] to ensure both children take all of their prescribed medications.

Trial Court Opinion, 10/24/19, at 2.

Thus, the trial court acknowledged that Mother had complied with administering prescription medications, with the exception of vaccinations, to the Children. We do not interpret the trial court's order to relieve Mother of her obligation to continue to provide M.M.'s prescription medications. In fact, in her brief, Mother states:

To the extent Father's issue is any prescribed medications, then common sense would dictate that both parties when they have custody of M.M. would make sure that the child takes the recommended dosage. To the extent Father infers from this issue that vaccinations should be included, then it is believed that the [c]ourt has already dealt with this issue appropriately. Your undersigned did not read the Order such that Mother would not be required to make sure that M.M. takes any prescribed medications[.]

Mother's Brief at 15. Thus, the trial court's order does not mean that only Father, and not Mother, is required to provide M.M. his prescription medications. Mother understands her continuing obligation to provide

prescription medications to M.M.  As such, had we not found waiver, we would conclude that there is no merit to Father's claim.  Accordingly, we decline to find that the court abused its discretion.  ***M.J.M.***, 63 A.3d at 334.  For the foregoing reasons, the September 6, 2019 order is affirmed.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/20/2020